UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

James P. Gianakis, Esq. (JG 3930)
GIANAKIS LAW LLC
51 JFK Parkway, 1st Floor
Short Hills, New Jersey 07078
Tel:  (973) 218-2500
Fax: (973) 218-2401
Email:  jim.gianakis@gmail.com

Attorney for Plaintiffs

|  |  |
|---|---|
| BECKY PUND and CHARLES PUND,<br><br>Plaintiffs,<br>v.<br><br>ST. FRANCIS COLLEGE,<br>IRMA GARCIA, and JOHN DOES 1-10,<br>jointly and severally,<br><br>Defendants. | UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br><br>Civil Action No. _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, Becky Pund ("Becky") and Charles Pund ("Charles") (collectively, the "Punds" or "Plaintiffs"), through their attorney, James P. Gianakis, Esq., by way of Complaint and Jury Demand against Defendants, St. Francis College ("St. Francis"), Irma Garcia ("Garcia"), and John Does 1-10, jointly and severally (collectively, "Defendants"), hereby state as follows:

**PARTIES**

1. At all relevant times to this action, Becky Pund was a student-athlete, first enrolled at St. Francis College and then, as a direct result of Defendants' unlawful actions and inaction, at New York University.  She lives at 263 Oak Street, Audubon, New Jersey 08106.

2. At all relevant times to this action, Charles Pund has been Becky Pund's father, who entered into contractual arrangements and relied upon definitive promises made by St. Francis, Ms.

Garcia, and their agents in connection with the recruitment of Becky to attend St. Francis as a scholarship athlete. He lives at 263 Oak Street, Audubon, New Jersey 08106.

3.   At all relevant times to this action, St. Francis College has been and continues to be an academic institution, affiliated with the Catholic religious faith, located at 4305, 180 Remsen Street, Brooklyn Heights, New York 11201.

4.   At all relevant times to this action, Irma Garcia has been and continues to be the Director of Athletics at St. Francis College, working out of its campus location at 4305, 180 Remsen Street, Brooklyn Heights, New York 11201.

5.   At all relevant times to this action, John Does 1-10 are currently unknown male or female individuals who were members of the Board of Directors, administration, athletic department and/or other parts of St. Francis and/or the St. Francis women's basketball program, who had duties and obligations to the Punds, made promises to the Punds, controlled Becky's college experience, aided and abetted in the commission of conduct complained of herein, and/or either acted within the scope of their employment at the workplace during working hours or to the extent they went beyond the scope of their employment, ratified, embraced and added to this conduct. As the parties engage in discovery, Plaintiffs retain the right to amend the Complaint to add these individuals by name.

## JURISDICTION AND VENUE

6.   This Complaint is brought by Plaintiffs seeking available compensatory and punitive damages pursuant to applicable federal, state, and local statutory, regulatory, and common law.

7.   The Court has subject matter jurisdiction over this action pursuant to *28 U.S.C. §1332 (Diversity)*. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states. Becky and Charles Pund are individuals who reside in New Jersey and who entered into contractual agreements with and detrimentally relied upon promises from St. Francis, Ms. Garcia, and their agents for Becky to attend school, to play

basketball, to be protected and kept safe along with her teammates under the care and supervision of St. Francis and its basketball program which had an obligation to comply with all applicable laws and regulations, and to have all costs associated with her tuition, room, board, medical treatment, and other expenses throughout her time at St. Francis covered by the college. St. Francis is incorporated in New York and has its principal place of business in New York.

8. The court has personal jurisdiction over St. Francis and venue is proper pursuant to *28 U.S.C. § 1391(a)* as Becky Pund attended school at St. Francis within the Eastern District of New York and the agreements and promises made to the Punds, and in turn, a substantial part of the unlawful events giving rise to these claims occurred within the Eastern District of New York.

### **STATEMENT OF MATERIAL FACTS**

9. This is a civil action for entry of a final judgment of compensatory and punitive damages, based upon (a) the unlawful breach by St. Francis, Ms. Garcia, and their agents of contractual obligations and promises upon which the Punds detrimentally relied, and (b) the unlawful efforts by St. Francis, Ms. Garcia, and their agents to cover up other unlawful conduct, to obstruct Becky and other female student-athletes from protecting themselves, and to discredit Becky in the college's further attempt to distance itself from legal and regulatory requirements to maintain a safe environment for its female student-athletes.

10. Becky was recruited by the St. Francis College Women's Basketball Program to attend St. Francis to attend school and to play basketball for the college. The Punds decided to have Becky attend St. Francis and to play basketball based upon specifically negotiated terms of agreement that, among other things, obligated St. Francis to cover all costs associated with her tuition, room, board, medical treatment, and other expenses throughout her time at St. Francis. Moreover, the Punds' decision to have Becky attend St. Francis was based upon specific

representations, warranties, and promises made by St. Francis to ensure the Punds that it provided a safe, protective environment for Becky and took extra special care of its female student-athletes.

11. Mr. John Thurston, the head basketball coach at the time, made a specific point during his introductory remarks to the Punds and several other young women and their families that the St. Francis women's basketball team had been the victim of a horrific situation that required significant legal intervention and left lasting scars on the college and program. As a result, Mr. Thurston made it very clear that there he and the college had implemented a zero tolerance policy regarding misconduct, that the young women in the basketball program were under his watch, and that strict guidelines were in place, including but not limited to curfews and restrictions on interaction with the St. Francis men's basketball team. Ms. Garcia, as the St. Francis Director of Athletics, affirmed and fully endorsed these protective guidelines, and went further by assuring the Punds and other young women and families that St. Francis took its responsibilities very seriously regarding compliance with every federal, state, and local law, including but not limited to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq., as well as every National Collegiate Athletic Association ("NCAA") requirement, regarding the safety, security, monitoring, investigation, reporting, and remediation of all matters related to the well-being of their student athletes, and in particular, their female student athletes. The Punds relied heavily on these assurances from Mr. Thurston and Ms. Garcia in their decision to entrust the next four years of Becky's formative years to St. Francis and its women's basketball program.

12. Unfortunately, Becky's time at St. Francis and immediately following her time at St. Francis was severely impacted by repeated acts of sexual abuse, sexual harassment, gender discrimination, racial discrimination, sexual orientation discrimination, harassment, intimidation, bullying, defamation, retaliation, and other unlawful conduct.

13. Mr. Thurston engaged in repeated acts of sexual abuse, sexual harassment, gender discrimination, racial discrimination, sexual orientation discrimination, harassment, intimidation, bullying, defamation, retaliation, and unlawful conduct, by among other things: (a) speaking to and about Ms. Pund and other women in a degrading, intimidating, bullying, and defamatory manner; (b) making sarcastic and belittling comments about their weight, diet, hairstyles, and clothing; (c) mocking their health and mental health status; (d) using sexist and racist terminology to describe them; (e) posting inappropriate photographs of women on the basketball team; (f) providing women with alcoholic beverages and making inappropriate advances toward them; (g) insinuating that Ms. Pund and other young women were somehow at fault for his inappropriate behavior; (h) insulting them in public and in private; and (i) knowingly and maliciously disparaging them, undermining their credibility and reputation, and interfering with their future opportunities.

14. Under Mr. Thurston's "watch" during this time period, all of the protective restrictions were also ignored. Members of the coaching staff and team regularly engaged in inappropriate conduct that included, among other things, drinking alcoholic beverages, and repeated bullying, hazing, intimidating, and degrading behavior toward the younger women in the program including Becky. Mr. Thurston made it known that he had his "favorites" who enjoyed a different set of standards and relationship with him, and as such, were enabled by him to establish this toxic hierarchy and culture within the women's basketball program.

15. Even more concerning was that when Becky attempted to share her concerns both verbally and in writing and to set parameters on the manner in which she and other women were being treated, she was belittled, bullied, and subjected to heightened levels of verbal abuse, hostility, insults, sarcasm, and retaliation in the manner in which she was spoken to and spoken about by Mr. Thurston, and in turn, dismissed by Ms. Garcia. In fact, Mr. Thurston even prohibited Becky from seeking proper medical treatment for a broken foot that resulted in her injury taking longer to heal,

potentially giving her a lifelong impairment or discomfort, and forcing Becky to incur significant out-of-pocket medical expenses to seek care and treatment on her own. All of the policies, representations, warranties, and promises about protecting its young women were out the window, in part because the women's basketball program was realizing some success and bringing some recognition to St. Francis. It became very clear to the Punds and other young women and families that the school placed greater importance on its on-court success than on the safety, health, and well-being of its female student athletes.

16. St. Francis, through the actions and inaction of its Athletic Director and administration, breached its legal and fiduciary responsibilities by, among other things: (a) acknowledging Mr. Thurston's inappropriate comments and behavior, but failing to take any action or to address, investigate, or follow organizational procedures in its issuance of any discipline of Mr. Thurston or protection of Becky and the many victims of Mr. Thurston's behavior; (b) excusing his inappropriate comments and conduct, to cover up what happened and to protect its brand, which in effect, only further empowered and enabled Mr. Thurston to continue his behavior with seemingly no consequence; (c) intimidating people from speaking out about Mr. Thurston's behavior and the organization's accepted culture; and (d) eliminating the problem by summarily dismissing people impacted and with knowledge of what has happened, thereby sending a further message about how these matters are viewed by the organization. As Becky reached out to Ms. Garcia and pleaded for assistance, both verbally and in writing – not just on her own behalf, but for other female victims of Mr. Thurston's behavior – the concerns were acknowledged, but nothing was done about it.

17. Indeed, Becky is one of the many victims in a long line of hard-working, dedicated young women who experienced Mr. Thurston's hostile and toxic environment. At least twelve (12) other women – including all but one member of Becky's recruiting class – shared their experiences and decided to transfer from St. Francis, while others remained at St. Francis subjected to his severe

and pervasive behavior, citing similar, disturbing accounts of Mr. Thurston's unlawful comments and conduct, as well as similar, ignored pleas to the administration of St. Francis to assist.

18. St. Francis wanted to protect its brand. Upon information and belief, members of the Board of Directors were involved in decisions related to enabling Mr. Thurston's behavior in the program and by extension in social environments and on trips, which serve as an extension of St. Francis's school environment, and more pointedly, in efforts to excuse what everyone openly recognized as Mr. Thurston's inappropriate comments and conduct. But because it was Mr. Thurston, nothing was done about it. Mr. Thurston's behavior continued and female students were told to accept it. Ms. Garcia's negligence and/or conscious failure in addressing the situation was also excused.

19. The facts speak for themselves. Mr. Thurston's conduct was severe and pervasive, knowing and malicious, and has resulted in significant emotional, psychological, physical, and financial damage. And when Ms. Garcia breached the confidentiality of her discussions with Becky and shared with Mr. Thurston that Becky had reported her concerns about the manner in which he was treating her and other women in the program, things only got worse with further harassment, discrimination, bullying, intimidation, retaliation, and disparagement of her name and reputation, culminating in Mr. Thurston cleaning out Becky's locker and making it clear to everyone that she was no longer welcome as a part of the team.

20. As a direct and proximate result of this unlawful and immoral conduct, Becky had no choice but to turn to physicians' care that continues to this day and to leave her scholarship, education, and athletic opportunities at St. Francis only to face the disturbing reality that Mr. Thurston and the college would continue to adversely affect her opportunities elsewhere, thereby inhibiting her ability to begin to heal and move on from this awful experience and unbearable

situation. The hostile and inappropriate environment that she was subjected to continues to severely impact her to this day – emotionally, psychologically, physically, and financially.

21. In a plea for help and effort to put an end to this toxic situation, not only for herself, but also for so many of the other women who had experienced similar mistreatment and for the women in the program and in the future who were at risk of being subjected to similar unlawful and immoral conduct, Becky begged Ms. Garcia to finally do something. Ms. Garcia assured Becky that she would be taken care of and protected – emotionally, psychologically, physically, and financially – and that the other women in the program would similarly be safeguarded.

22. Becky was referred to the college's Title IX Coordinator, and an investigation was opened. Yet after interviewing Becky (and assuring the Punds that all the active players would be interviewed immediately, that all communications would be strictly confidential and handled one on one, and that the college takes these matters very seriously), it appeared that the investigation was conducted under the careful watch of the very people about whom the concerns were raised. Several recent alumni of the women's basketball program at St. Francis shared similar disturbing experiences that caused stress, anxiety, depression, eating disorders, thoughts of suicide, and ultimately decisions to either accept this abuse or to leave the school. Other recent alumi reported that they were never contacted by the college's investigator. The then current women's basketball team reported being intimidated and coerced with concern about retaliation if they shared what was really happening, and several members of the then current women's basketball team shared with Becky that they had been told that "Becky is only doing this for the money" which could not have been further from the truth. In the end, St. Francis concluded that nothing was wrong and that nothing should be done to correct the situation. Moreover, despite multiple requests for a copy of the investigation report, it has not been provided.

23. The Punds continued their efforts, reaching out to St. Francis in attempt to protect the then current members and expected recruiting classes of the women's basketball team, as well as to find some resolution to the manner in which Becky and other young women had been mistreated. They confirmed evidence from several other former female student athletes at St. Francis, who were victims of similar behavior, as well as from students, coaches, professors, and members of the St. Francis administration who have first-hand knowledge of the hostile and toxic environment that was enabled and the particular actions that were directed at Becky in an attempt to cover up what was happening. And still nothing meaningful was done.

24. Upon information and belief, St. Francis has a set of policies and procedures that clearly outline how these matters should have been addressed and the consequences for not following those standards. Nevertheless, Defendants have violated several federal, state and local laws, as well as St. Francis's own policies and procedures, and in so doing, St. Francis and its senior administration failed to protect the legal rights, reputation, health and well-being of its female student athletes, and in turn, entire college community. People in positions of authority and control engaged in inappropriate and unlawful conduct, manufactured reasons to somehow rationalize it, and the institution failed to truly address known issues of sexual abuse, sexual harassment, gender discrimination, harassment, intimidation, bullying, hostile work environment, defamation, and retaliation, which instilled fear, anxiety, and depression resulting in significant damage across every victim and the family members, friends, and support around them.

25. The Punds have attempted to resolve this matter, but have received nothing more than meaningless responses, coupled with an understanding the Defendants have gone out of their way to disparage them, which all together has only added to their emotional, psychological, physical, and financial damages. The Punds have no choice but to seek legal action.

**RELIEF REQUESTED**

WHEREFORE, for the reasons stated herein, the Punds demand judgment against Defendants, jointly and severally, under any and all of the following causes of action:

    a.    Breach of contract;

    b.    Promissory estoppel;

    c.    Breach of duty of loyalty;

    d.    Breach of fiduciary duty;

    e.    Tortious interference with actual and/or prospective business dealings;

    f.    Harassment;

    g.    Discrimination;

    h.    Retaliation; and

    i.    Defamation.

WHEREFORE, for the reasons and causes of action stated herein, the Punds demand a final judgment against Defendants, jointly and severally, for relief, including but not limited to:

    a.    St. Francis must provide a complete copy of the investigation report that it prepared in connection with the previous complaints raised by the Punds and many other female student-athletes, as well as all other communications related to how the investigation was conducted and what, if anything, was addressed and/or changed as a result of the investigation related to Ms. Garcia, Mr. Thurston, the athletic department, and the women's basketball program.

    b.    St. Francis must acknowledge that the women's athletic program and athletic department as a whole needs to be reviewed and that the administration must make changes to protect its student-athletes.

    c.    In connection with that review and investigation, the administration must review the role that Ms. Garcia played in concerns raised by the Punds and others about Mr. Thurston and the women's basketball program, and as appropriate, must be disciplined, which may include relieving her of her responsibilities.

    d.    Compensatory damages to compensate the Punds for, among other things:

        i.    Becky having no choice but to leave St. Francis for health reasons and after Mr. Thurston removed her from the team and disparaged her, which resulted the Punds incurring the expense of three (3) years of tuition, room and board, plus interest on the loans that they were forced to take to support her continuing education.

        ii.    Becky having no choice but to incur the expense of covering out of pocket medical expenses for the medical care and treatment of an injury that resulted from her playing basketball for St. Francis that should have been covered by the school, but despite numerous requests, was not.

        iii.    The significant emotional distress, pain and suffering, stress, anxiety, and depression that Becky, and in turn Charles Pund, have been forced to endure from her period of time with St. Francis, Mr. Thurston's actions, and Defendants' actions and inaction that continue to have significant, adverse impact on their health and well-being.

    e.    Punitive damages for the malicious and intentional manner in which Defendants decided to treat and treated not only the Punds, but so many other

       young women who were affected by Defendants' unlawful and inappropriate conduct;

h. Attorneys' fees and costs associated with the Punds having to pursue this legal action to address concerns that should have been addressed by Defendants; and

i. Such other relief as the Court deems just and equitable based upon the position taken by Defendants to avoid their legal obligations and severe impact it has caused and continues to cause not only the Punds but so many other young women who were affected by Defendants' unlawful conduct.

## JURY DEMAND

In the event this cause of action proceeds to trial, Becky Pund and Charles Pund hereby requests that it be heard and decided by a jury.

## DESIGNATION OF TRIAL COUNSEL

James P. Gianakis, Esq., is hereby designated as trial counsel for Becky Pund and Charles Pund in this cause of action.

## **CERTIFICATION PURSUANT TO LOCAL RULE 11.2**

In accordance with Local Civil Rule 11.2, I hereby certify to the best of my knowledge that the matter in controversy in this action is not the subject of any other action or proceeding pending in any court or arbitration tribunal that no such action or arbitration is presently contemplated.

I further certify that at present time, I am unaware of any other parties who should be joined in this action.

                                            Attorney for Plaintiffs

Dated: February 24, 2023                By: *s / James P. Gianakis*
                                                JAMES P. GIANAKIS, ESQ.

                                                James P. Gianakis, Esq. (JG 3930)
                                                GIANAKIS LAW LLC
                                                51 JFK Parkway, 1st Floor
                                                Short Hills, New Jersey 07078
                                                Tel: (973) 218-2500
                                                Fax: (973) 218-2401
                                                Email: jim.gianakis@gmail.com